**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CAROLYN DECHAINE,

Plaintiff,

v. No. 1:23-cv-1134-KRS-LF

LIBERTY MUTUAL INSURANCE COMPANY,

Defendant.

**MEMORANDUM OPINION AND ORDER**

This case arises out of a claim for damages made by Plaintiff Carolyn Dechaine under a homeowner's insurance policy issued by Defendant Liberty Mutual Insurance Company.[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the undersigned to conduct dispositive proceedings in this matter and to enter a final judgment. (Docs. 8 and 9). Currently before the Court is Defendant's Motion For Summary Judgment on Count III ("Motion") (Doc. 98). Having considered the parties' briefing, the record, and relevant law, the Court grants the Motion.

[1] Defendant alerts the Court—as it did in its initial filing as well as every filing since then—that the actual underwriter of the homeowner's insurance policy issued to Plaintiff is LM Insurance Corporation, not Liberty Mutual Insurance Company. *See* (Doc. 98 at n. 1; Doc. 115 at 1 n. 1). Liberty Mutual Insurance Company apparently is the parent company of LM Insurance Corporation. *See* (Doc. 2). According to Defendant, "[d]espite having had the opportunity to amend her complaint, Plaintiff continues to prosecute this action against the wrong insurance company." (Doc. 98 at 1 n.1). The Court does not know what Plaintiff's position is on the matter of amending her complaint, but the record indicates that Plaintiff stipulated to the fact that LM Insurance Corporation is the issuer of the policy. *See* (Doc. 22 at 2). Given that there does not appear to be any dispute over the identity of the responsible Liberty Mutual entity, the misnomer in the case caption can be corrected without seeking to file an amended pleading. Rather, the parties can simply file an unopposed or joint motion to substitute LM Insurance Corporation for Liberty Mutual Insurance Company, with the motion also requesting that the case caption be amended accordingly. A motion of this sort seeks a technical amendment only; is fairly routine; and should be filed to ensure a clean record on which the case may proceed. *See, e.g., In re Motor Fuel Temperature Sales Pracs. Litig.*, No. 07-MD-1840-KHV, 2009 WL 1208074, at *2 (D. Kan. May 1, 2009), *objections overruled*, 261 F.R.D. 577 (D. Kan. 2009); *see also* Fed. R. Civ. P. 1 (stating that the rules of civil procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding").

## BACKGROUND

### 1. The Policy

The dispute set forth in the First Amended Complaint (Doc. 55) concerns coverage under an insurance policy for damage to Plaintiff's home allegedly caused by a wind and rainstorm on or about June 13, 2020. The insurance policy was originally purchased on January 13, 2016 by Plaintiff's then wife, and renewed annually thereafter. Plaintiff's claims arise under the version of the policy in effect from January 13, 2020 through January 13, 2021. *See* (Doc. 98-1, LibertyGuard Deluxe Homeowners Policy No. H35-291-101013-70 0 4) (hereinafter "the Policy"); *see also* (Doc. 22, Stipulation #2).

### 2. The June 13, 2020 Storm

According to Plaintiff, she contacted Defendant to make a claim under the Policy almost immediately after the storm, as emergency measures had to be taken to prevent further damage to the home's interior from on-going water intrusion.[2] Over the next several months, Defendant processed Plaintiff's claim and investigated the loss. A dispute concerning an insurance company's investigation into the scope and extent of damage caused by a single weather event, and the insurance company's adjustment regarding the amount of benefits owed under the Policy, would seem to present a fairly straightforward matter. In reality, the parties' dispute is much more complicated than that. The June 13, 2020 wind and rain storm was just one of many leakage incidents reported by Plaintiff to Defendant going back at least as far as May 26, 2019. And according to Defendant, its adjustments of those other claims as well as of the June 13, 2020 claim needed to take into account repairs that had occurred on and off over the years as a result of water

[2] Plaintiff describes the damage from the storm as "catastrophic leaking," with water "pour[ng] through the ceiling in the kitchen, the breakfast nook, the garage, the stairwell, and the living room." (Doc. 112-1, ¶¶ 4, 6).

intrusion into the house caused by defective workmanship by the contractor that had installed a new roof in 2016. While it is Plaintiff's position that all of the damage to her home for which she seeks coverage in the present lawsuit was caused by the June 13, 2020 storm and/or faulty repairs to fix the damage caused by that storm, Defendant's position is otherwise. As a result, all of Plaintiff's legal claims concerning the June 13, 2020 insurance claim cannot be resolved without considering the entire history of water intrusions into the house and associated claim submissions.

However, it is not necessary for the Court to delve into the entire history of Plaintiff's leaky house to resolve the current Motion. The Motion concerns only Plaintiff's "Third Cause of Action" alleging a claim under New Mexico's Unfair Practices Act ("UPA"), N.M. Stat. Ann. § 57-12-1 *et seq.* And Defendant's arguments for summary judgment on the UPA claim do not turn on Plaintiff's complicated claims history. Rather, Defendant argues it is entitled to summary judgment on Plaintiff's UPA claim as a matter of law because Plaintiff has not alleged a legally sufficient "unfair trade practice" within the meaning of the statute.

### 3. The UPA

The UPA declares that "[u]nfair or deceptive trade practices… in the conduct of any trade or commerce are unlawful." N.M. Stat. Ann. § 57-12-3.[3] "Trade" or "commerce" is defined to "include[ ] the advertising, offering for sale or distribution of any services and any property and any other article, commodity or thing of value." N.M. Stat. Ann. § 57-12-2(C). An "unfair or deceptive trade practice" is defined as:

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in

[3] The UPA also prohibits "unconscionable trade practices," N.M. Stat. Ann. § 57-12-3, but this case only involves allegations of "unfair or deceptive trade practices."

the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person and includes:

(1) representing goods or services as those of another when the goods or services are not the goods or services of another;

(2) causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(3) causing confusion or misunderstanding as to affiliation, connection or association with or certification by another;

(4) using deceptive representations or designations of geographic origin in connection with goods or services;

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have;

(6) representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;

(7) representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another;

(8) disparaging the goods, services or business of another by false or misleading representations;

(9) offering goods or services with intent not to supply them in the quantity requested by the prospective buyer to the extent of the stock available, unless the purchaser is purchasing for resale;

(10) offering goods or services with intent not to supply reasonable expectable public demand;

(11) making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction;

(12) making false or misleading statements of fact for the purpose of obtaining appointments for the demonstration, exhibition or other sales presentation of goods or services;

(13) packaging goods for sale in a container that bears a trademark or trade name identified with goods formerly packaged in the container, without authorization, unless the container is labeled or marked to disclaim a connection between the contents and the trademark or trade name;

> (14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;
>
> (15) stating that a transaction involves rights, remedies or obligations that it does not involve;
>
> (16) stating that services, replacements or repairs are needed if they are not needed;
>
> (17) failing to deliver the quality or quantity of goods or services contracted for;
>
> (18) violating the Tobacco Escrow Fund Act …;
>
> (19) offering or providing unposted or unadvertised pricing or service based on the buyer's gender or perceived gender identity; provided, however, that this provision does not apply to persons regulated by the office of superintendent of insurance pursuant to the New Mexico Insurance Code …; or
>
> (20) charging an applicant a fee in violation of the Uniform Owner-Resident Relations Act ….

N.M. Stat. Ann. § 57-12-2(D).

### 4. Plaintiff's UPA Allegations, And Defendant's Undisputed Facts Regarding Those Allegations

Plaintiff's UPA claim is based specifically on subsection (D)(17) of § 57-12-2. *See* (Doc. 55 ¶ 47 (alleging that Defendant violated the UPA by "fail[ing] to provide the quality or quantity of services Plaintiff paid for when purchasing her homeowner's policy"). The First Amended Complaint refers generally to "the conduct described" in the General Allegations section of the pleading as the factual basis for the UPA claim. As a result, Defendant's Motion addresses all of the conduct described in the General Allegations section. Plaintiff's response to the Motion, however, states that Plaintiff's UPA claim is "predicated on Defendant's deceptive and misleading statement that there was neither a dollar nor a temporal limit to her ALE coverage." (Doc. 112 at 3). Therefore, the Court does not need to address Defendant's arguments in the Motion concerning Defendant's other conduct alleged in the General Allegations concerning coverage under the Policy for damage caused by "seepage." The only disputed issue raised by the Motion is whether

Plaintiff's allegations concerning Defendant's failure to provide ALE coverage states a legally valid UPA claim. *See* (Motion, Doc. 98 at 3, Undisputed Fact #3[4] ("Plaintiff alleges Defendant made misrepresentations about … the scope of coverage for [ALE].")).

"ALE" refers to "alternative living expenses." The Policy provisions applicable to alternative living expenses state as follows (relevant parts in italics):

> **COVERAGE D - Loss Of Use**
>
> The limit of liability for Coverage D is the total limit for all the coverages that follow.
>
> 1. If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, …. the following…..
>
>    a. **Additional Living Expense**, meaning *any necessary increase in living expenses* incurred by you so that your household can maintain its normal standard of living; …
>
>    ….
>
> Payment …. will be for *the shortest time required* to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

(Doc. 98 at 4, Undisputed Fact #4) (emphasis added).

In addition to the above, the Policy includes an endorsement that modifies the Section D benefits:

> **HOMEPROTECTOR PLUS ENDORSEMENT**
>
> ….
>
> **C. INCREASED LIMIT – COVERAGE D**
>
> We will pay the amount of loss covered by Coverage D which *is actually sustained by you during the 12*

[4] The Motion recites eight facts that purportedly are undisputed on which the Motion is based. *See* (Doc. 98 at 2-5). Plaintiff's response brief confirms that Facts ##1-4 and #6-7 are undisputed, and that Facts #5 and #8 are also undisputed but with minor qualifications, *see* (Doc. 112 at 1-2). Accordingly, the Court refers to the eight facts set out in Defendant's Motion as "Undisputed Facts #1-#8."

> *consecutive months following the date of loss,* subject to the periods of time under paragraphs 1, 2 and 3 of Coverage D- Loss of Use.

(*Id.* at 5, Undisputed Fact #4) (emphasis added).

The Motion does not recite any undisputed facts concerning whether and in what amounts Defendant approved the payment of ALE to Plaintiff stemming from the June 13, 2020 weather event, or, if payments were made, what dates were covered by those payments.[5] Nor can the Court determine undisputed facts concerning these matters by consulting Defendant's answer to the First Amended Complaint, because the Answer does not provide any substantive responses.[6] From Plaintiff's allegations, however, it appears that Plaintiff was living outside her home, allegedly due to damage from the June 13, 2020 storm, in two separate time periods: (1) from about June 14, 2020 through February 28, 2021;[7] and (2) from October 1, 2022 until sometime in March 2023.[8] If these allegations are true, there was a period of approximately 19 months between when Plaintiff returned to the home after moving out in the immediate aftermath of the storm, and when she

---

[5] The Court declines to search out whether Defendant included any facts relevant to the present Motion in its separately filed summary judgment motion on Counts I and II (Doc. 100). *See Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) ("'Judges are not like pigs, hunting for truffles buried in briefs.' '[Parties], rather than courts …, [must] ferret out and articulate the record evidence considered material to each legal theory advanced on appeal.'" (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); and *Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 81–82 (1st Cir. 2001)).

[6] Defendant answered virtually every factual allegation in the First Amended Complaint with the following response: "This Defendant states that discovery in this case may affect the outcome of its investigation and evaluation of Plaintiff's claim. Therefore, at this time, this Defendant has insufficient information upon which to form a belief as to the truth of the allegations in [this] paragraph …, and it is denied." *See* (Doc. 62). Defendant filed its Answer *eighteen months* after the lawsuit was initiated in state court, and *three years plus an additional four months* after Plaintiff submitted the June 13, 2020 claim, which would seem to have been more than enough time for Defendant to have conducted a sufficient investigation to be in the position to have responded substantively to Plaintiff's allegations.

[7] *See* (Doc. 55 ¶ 8 (alleging that Plaintiff moved out of her home for approximately 9 months "[b]eginning in June 2020"); *id.* ¶ 9 (alleging that Plaintiff moved back into the house in March 2021)).

[8] *See* (Doc. 55 ¶¶ 16, 23 (alleging that, more than a year after moving back into the house, in the summer of 2022, Plaintiff found evidence of water damage on the first floor of her home, and moved back out again on October 1, 2022 "until March 2023" while necessary remediation work was performed)).

moved out for the second time.[9] Plaintiff alleges that she became concerned about her contractor's lack of immediate availability to do the work, but was assured by Defendant "that, no matter how long it took for … the contractor to do the work, Plaintiff's homeowner's policy would provide coverage." (Doc. 55 ¶ 12). Plaintiff does not allege the timing of these allegations, but they seem to correlate with the first time period in which Defendant apparently did provide coverage for ALE.[10] If Plaintiff moved back in the house in March 2021 as she alleges, then she would have been living there for over a year when, on or about June 3, 2022, she requested that her ALE in connection with the June 13, 2020 storm be reinstated. *See* (Doc. 98 at 5, Undisputed Fact #7).[11]

---

[9] The First Amended Complaint provides some details about what supposedly went on in this 19-month period, describing what seems to be round after round of inspections and remediation work beginning only "[a] few days after" Plaintiff returned to the home in March 2021, due to Plaintiff's discovery at that time of signs of water damage in one spot on the second floor of the house. (Doc. 55, ¶ 9). Remediation work was performed, leading to the discovery of other water intrusions and further remediation efforts by a series of contractors, all of which was happening on the second floor apparently while Plaintiff was living in the house. (*Id.*, ¶¶ 11, 13, 14). But then, in the summer of 2022, Plaintiff allegedly discovered evidence of water damage on the first floor, which led to further inspections, and ultimately Plaintiff retaining still another remediation company. That company started work on the entire house on October 1, 2022, which is when Plaintiff alleges she was required to move out for a second time. (*Id.* ¶¶ 15-16).

[10] Defendant confirms that it did pay some ALE benefits related to the June 13, 2020 storm, but not in its undisputed fact statement in the Motion. Rather, Defendant asserts in its reply brief (without citation to the record) that "it is undisputed ALE was paid on Plaintiff's June 2020 claim through June 23, 2022." (Doc. 115 at 7). Of course, "[c]ounsel's statements in a brief … are not evidence," *In re Lang,* 293 B.R. 501, 513 (B.A.P. 10th Cir. 2003) (citations omitted). The Court takes counsel's statement in good faith only as confirmation that some payments were made, but not as proof of the time period covered by those payments, as the dates Defendant gives in its reply brief do not quite match up with the dates in the First Amended Complaint. According to Plaintiff's allegations, she moved back into the home in March 2021 and did not move out again until October 1, 2022. If those allegations are credited, Plaintiff would not have actually incurred ALE for the period of March 2021 through June 23, 2022, which is the date through which Defendant claims to have paid ALE.

[11] In support of Undisputed Fact #7, the Motion cites an internal note dated June 3, 2022 made by an adjuster named Rachel Danielson, which states:

> I spoke with Carolyn Dechaine, she expressed that she is attempting to get on the CTR schedule for 2nd story rebuild to start, but she is having a hard time getting responses from CTR's as their crews are getting ill, she is severely ill currently, and she is requesting for further consideration of ALE once repairs start as she is highly concerned for any type of contact with mold and COVID during the final repairs. I advised once she is on a repair schedule I would have to collect all repair dates and information and request management for ALE consideration. She understood and thanked.

(Doc. 98-5).

On or about June 21, 2022, "Defendant advised Plaintiff verbally and via letter of the limitation on her ALE coverage." (Doc. 98 at 5, Undisputed Fact #8).[12] Defendant does not provide the Court with the coverage letter referenced in Undisputed Fact #8, but Plaintiff has submitted it with her response brief. The letter states in relevant part as follows:

> We have recently reviewed your claim for damages and would like to take this opportunity to provide you with information regarding your Additional Living Expenses.
>
> We are pleased to advise you that we have completed our estimate for the value of repairs to your home and determined the expected length of time for those covered repairs. In a separate settlement letter, we explained details of this agreement and how the payments for those repairs will be distributed.
>
> Based on the scope of damages and market conditions the projected end date of your temporary housing and/or additional living expenses was March 29th 2021[.] *Based on the current policy language no further extensions would be warranted as currently the timeframe is beyond the 12 consecutive months after the date of loss*.

(Doc. 112-2 (emphasis added)); *see also* (Doc. 55 ¶ 17 (alleging that Plaintiff sought coverage from Defendant for the costs of alternative living arrangements beginning on October 1, 2022, but "Defendant, by letter dated June 23, 2022, this time denied coverage on the basis that too much time had elapsed from the date of loss to the request for alternative housing coverage").

### 5. Plaintiff's Additional Facts In Response to Defendant's Undisputed Facts

As noted previously, Plaintiff does not dispute the asserted fact in Defendant's Motion that she was notified of the Policy Endorsement's 12-month limit on ALE coverage in June 2022. But

[12] In support of Undisputed Fact #8, Defendant cites only an internal note dated June 21, 2022 made by its adjuster Rachel Danielson, which note does not refer to either a verbal conversation or a letter. Instead, it states in relevant part that the adjuster "left a message for [Plaintiff] … advis[ing] of clarification of ALE HPP endorsement of 12 months from DOL" and "advis[ing] will send follow up email." (Doc. 98-6). Plaintiff does not dispute the facts in paragraph 8 of Defendant's fact statement, however, asserting only that she "dispute[s] the implication that Defendant did not *otherwise* inform her that payment for [ALE] … was *un*limited and that the time period over which such payments would be made was likewise *un*limited" (Doc. 112 at 2 (emphasis added)).

Plaintiff's UPA claim depends on an additional fact not included in the Motion's fact statement, which is that, on *other* occasions, Defendant told Plaintiff that payment for the costs of ALE was unlimited and that the time period over which such payments would be made was likewise unlimited. (Doc. 112 at 2). Plaintiff cites her Affidavit in support of this additional fact. In the Affidavit, Plaintiff states the following:

> 2. In connection with the remediation and repair of my home, I needed to make use of the Alternative Living Expenses ("ALE") coverage included in my homeowner's policy. I am severely immunocompromised and have multiple environmental sensitivities. Exposure to the contaminants in my home caused by the work involved in remediating and repairing it – the cutting, sanding, and other steps that must be taken in completing such work – would make me extremely ill. In addition to the fact that the house was uninhabitable for anyone while repairs were being completed, being in the home during that time would have threatened my health.
>
> 3. As a result, it was critically important that I have adequate ALE coverage to allow me to be away from my home when I needed to be away. Beginning in the spring of 2021, I had several conversations with Rachel Danielson, who was my assigned claims adjuster at the time, about the scope of my ALE coverage. I had those conversations because the lack of availability of contractors delayed the needed repairs and I wanted to be sure that, once the contractors I had secured were available, my ALE coverage would be [sic] still apply. More than once, Ms. Danielson assured me that whenever the contractors were ready to begin, my ALE coverage would be there and that I did not need to be concerned about how long it was taking for the work to start. She also told me that my ALE coverage would apply for as long as it took to complete the repairs.

(Doc. 112-1).[13]

[13] In addition to the discussion in her Affidavit about conversations with Rachel Danielson concerning the ALE coverage being unlimited in scope and time, which conversations supposedly occurred when Danielson was the adjuster on Plaintiff's claim, Plaintiff also alleges in the First Amended Complaint that the same topic was discussed in conversations she had with Defendant when her Policy came up for renewal in February 2023. The First Amended Complaint alleges that Plaintiff "asked several pointed questions about that coverage because Defendant had denied in October 2022 a claim for alternative living expense coverage under her then-current policy on grounds that the coverage was limited to a period for 12 months. … Nonetheless, in that February 2023 conversation, Defendant more than once represented to Plaintiff that there would be no time limit or dollar limit for alternative living expenses coverage." (Doc. 55, ¶ 28). According to Plaintiff, Defendant made that representation in February 2023 despite

**6. The Parties' Contentions**

Defendant's Motion makes essentially two arguments for why Plaintiff's claim for an unfair trade practice fails as a matter of law. First. Defendant argues that Plaintiff's allegations regarding Defendant's failure to pay ALE for the disputed period is simply a breach of contract claim, which as a matter of law does not give rise to a UPA claim absent some independent unfair or misleading conduct. Second, Defendant argues that, even if Plaintiff can point to some unfair or misleading conduct independent of Defendant's alleged failure to provide ALE coverage under the Policy, that conduct, i.e., the alleged misrepresentations concerning scope and time limits applicable to the ALE benefit, happened *after* the contract went into effect. Defendant argues that therefore those alleged misrepresentations cannot form the basis of a claim under the UPA. For her part, Plaintiff agrees with the premise of Defendant's first argument but contends it is inapplicable, while she disagrees with the premise of Defendant's second argument altogether. That is, Plaintiff contends that she *has* presented evidence of a misrepresentation independent of the failure to provide ALE coverage, and therefore her UPA claim is based on something more than a mere breach of contract. And she argues that New Mexico law permits a plaintiff to rely on misrepresentations that occurred after the parties entered into the contract under which the defendant allegedly failed to provide services in order to state an actionable claim under the UPA.

**STANDARD OF REVIEW**

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A

---

Plaintiff having pointed out in the same conversation that Defendant had acted to the contrary in the past when it had denied a request by Plaintiff for additional ALE coverage. Because they are not presented in evidentiary form, the Court does not consider these additional alleged conversations in resolving the current Motion.

"genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986). A fact is "material" if it might affect the outcome of the case. *See id*. at 248. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## DISCUSSION

### A. Whether Plaintiff Has Presented Evidence To Satisfy The Requirement Of Unfair Or Misleading Conduct In Addition to The Alleged Failure To Provide Contracted-For Coverage Under The Policy

Defendant's first argument is based on *Stevenson v. Louis Dreyfus Corp*., 1991-NMSC-051, 112 N.M. 97, 811 P.2d 1308. The issue before the court in *Stevenson* was the validity of a jury instruction that allowed the jury to find a violation of the UPA with evidence that the defendant failed to deliver the quantity of goods contracted for, and nothing more. *Id.,* ¶¶ 9-10, 112 N.M. at 99, 811 P.2d at 1310. The court held this instruction was erroneous because its import was, "that by failing to deliver the quantity of goods contracted for, [the defendant] knowingly made a false or misleading statement." *Id.*, ¶¶ 11-13, 112 N.M. at 99, 811 P.2d at 1310. The court observed that if "the mere fact that [the defendant] failed 'to deliver the quantity of goods or services contracted for'" meant that the defendant engaged in an unfair trade practice, then "every breach of contract case [would] be [ ] a violation of the Act," a result the court "did not believe" the legislature intended. *Id.*

The upshot of *Stevenson* is that a plaintiff may not point to a mere failure to deliver goods or services to state a claim based on § 57-12-2(D)(17). "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." *Diversey Corp. v. Chem-Source Corp.,* 1998-NMCA-112, ¶ 17, 125 N.M. 748, 754,

965 P.2d 332, 338. And according to *Stevenson*, the act of failing to provide contracted-for services cannot by itself be the unfair or misleading conduct. Rather, a plaintiff must point to specific conduct independent of the conduct, failure, or omission that constitutes the alleged breach of the contract in order to state a valid UPA claim based on subsection (D)(17). *See id.* ("A jury instruction that fails to include the element of misrepresentation, falsity, or deception, would certainly be an inaccurate statement of the law, as it was in *Stevenson*."). Plaintiff does not quarrel with the holding of *Stevenson,* but states that case is inapplicable here because she does allege more than just a failure to deliver services. Specifically, Plaintiff points to her testimony concerning the alleged verbal statements of Defendant's adjuster that the Policy's coverage for ALE was unlimited in time and scope. These statements, according to Plaintiff, in conjunction with Defendant's refusal to provide additional ALE coverage, state a valid claim under § 57-12-2(D)(17).

Defendant's opening brief does not explicitly comment on the alleged verbal statements of its adjuster on which Plaintiff premises her UPA claim. But Defendant obviously was aware that Plaintiff's UPA claim was based on those alleged verbal statements, as the Motion goes on to argue that "post-sale misrepresentations are not actionable." (Doc. 98 at 7). If that were the end of the matter, the Court would find that Plaintiff has sufficiently alleged a misrepresentation that is more than a simple breach of contract, and would immediately move on to analyze the remainder of the UPA claim. But Defendant's reply brief goes off on a different tangent with an argument that targets Plaintiff's Affidavit. According to Defendant, the Affidavit is "conclusory and self-serving," and therefore "insufficient to raise a genuine issue of material fact." (Doc. 115 at 2 (quoting *Cooke v. Chavez*, No. CIV 01-103 MCA/LFG, 2002 WL 35649604, at *3 (D.N.M. 2002)).

Defendant's argument that Plaintiff's Affidavit is conclusory is itself conclusory, as Defendant does not explain how the label "conclusory" applies. Defendant argues that Plaintiff's Affidavit is similar to the affidavit rejected in *Famiglietta v. K-Bear, LLC*, No. CIV 12-824 LFG/ACT, 2013 WL 12329915, at *5 (D.N.M. July 23, 2013), wherein the court noted "deficiencies relate[d] to summary and self-serving contentions or denials by [the plaintiff] about her claims and her own work performance." But the portion of the plaintiff's affidavit testimony in *Famiglietta* to which Defendant refers was that the plaintiff "'fully and completely performed' her duties and responsibilities during her entire employment with [the defendant]." *Id.* Defendant does not explain how Plaintiff's testimony in her Affidavit, describing specific telephone conversations she had with the adjuster, is in any sense the same as the plaintiff's affidavit testimony in *Familgietta*. Instead, Defendant quotes from Plaintiff's *response brief* rather than from her Affidavit. And even then, Defendant quotes only the conclusory statement in Plaintiff's response brief that Defendant "misrepresented the scope of Plaintiff's ALE coverage to her" (Doc. 115 at 3 (quoting Doc. 112 at 5)), while leaving out the additional factual details given in the response brief to support that conclusory statement. In fact, Plaintiff's response brief explains what the misrepresentations were (Defendant even acknowledges that it does, *see* (*id.* ("specifically that there was no dollar or time limit on [Plaintiff's] ALE coverage")), and then Plaintiff's Affidavit gives additional information about how, when, and by whom the representations were conveyed to her. Neither Plaintiff's response brief nor her Affidavit rely solely on conclusory arguments or factual statements to support Plaintiff's UPA claim.

A conclusory affidavit is one that does "not provide any factual bases for [a plaintiff's] inference." *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir.1995); *see, e.g., Cooke*, 2002 WL 35649604, at *4 (holding that the plaintiff's denial in an affidavit that the motorcycle he had

been riding was stolen was conclusory absent the presentation of any facts to support the denial). Plaintiff's Affidavit sets forth the content of specific statements made by an employee of Defendant. Those statements were made directly *to Plaintiff*, meaning Plaintiff has personal knowledge of them and is competent to testify concerning what was said to her. And there is no reason suggested on the record why Plaintiff's testimony would be precluded or held inadmissible at trial. *Cf.* Fed. R. Evid. 801(d)(2)(D) (explaining that an out-of-court statement made by a party's agent or employee on a matter within the scope of that relationship is admissible if offered against that party).

Nor does Defendant's argument fare better insofar as the label "self-serving" is concerned. "As long as an affidavit is 'based upon personal knowledge and set[s] forth facts that would be admissible in evidence,' such averment of a party is legally competent to oppose summary judgment, notwithstanding its inherently self-serving nature." *Fed. Ins. Co. v. More*, No. CV 99-1035 JC/RLP, 2004 WL 7338033, at *2 n.3 (D.N.M. Apr. 21, 2004) (quoting *Williams v. Shields*, 77 Fed. Appx. 501, 503 (10th Cir. 2003) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991))); *see also Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." (citation omitted)); *C.R. Pittman Constr. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) ("A party's own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone."). Despite the boilerplate references in case law against "self-serving" affidavits, it is not the self-serving nature of the testimony that disqualifies the affidavits in question but rather insufficiencies of the affidavits in other respects, such as failing to set forth specific facts that would either avoid or support summary judgment.

*E.g., Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). Here, the Court is not accepting as true the statement by Plaintiff that a misrepresentation was made. Rather, the Court considers Plaintiff's affidavit presents competent evidence showing that certain statements were made to Plaintiff by Defendant's adjuster, and then concludes those statements could amount to a misrepresentation given Defendant's later denial of Plaintiff's claim for ALE benefits beyond the limits that Defendant states are set forth in the Policy. If Defendant is arguing that its adjuster never made the statements set forth in Plaintiff's Affidavit regarding there being no dollar or time limit on the ALE coverage, that would mean only that a disputed fact issue existed on that issue, given Plaintiff's contrary testimony based on personal knowledge. If, however, Defendant is objecting to Plaintiff's *argument* that a misrepresentation occurred, that ultimate conclusion too would be for the jury to decide given there is evidence in the record to support certain statements were made to Plaintiff and those statements were misleading in light of the position Defendant takes in this lawsuit.

In sum, the Court rejects Defendant's argument based on *Stevenson* that Plaintiff's UPA claim fails as a matter of law. Plaintiff has put forth evidence concerning one or more misrepresentations made by Defendant's agent concerning the availability of ALE coverage under the Policy that is separate and apart from the alleged failure to provide ALE coverage under the Policy, and hence has stated more than a more breach of contract.

### B. Whether The Alleged Misrepresentations Satisfy The "In Connection With" Element Of Plaintiff's UPA Claim

A UPA claim based on "a failure to deliver the quantity of goods or service contracted for" includes the following elements: "(1) [the defendant] made a false or misleading representation; (2) [the defendant] made the representation in connection with the sale of goods or services knowing it was false or misleading; (3) [the defendant] made the representation in the regular

course of trade or commerce; and (4) [the defendant's] representation 'may, tends to or does, deceive or mislead any person.'" *Bigelow v. Larry H. Miller Corp.- Albuquerque,* No. A-1-CA-38562, 2022 WL 17337665, at *2 (N.M. Ct. App. Nov. 30, 2022) (quoting *Stevenson*, 1991-NMSC-051, ¶ 13 (internal quotation marks and citation omitted)). "In addition, because Plaintiff's claim was made under Section 57-12-2(D)(17) of the UPA, these elements must exist in conjunction with a contract under which [the defendant] has some obligation to provide goods or services." *Id.* (citing *Stevenson*, 1991-NMSC-051, ¶¶ 15, 17-18; and *Jones v. Gen. Motors Corp.*, 1998-NMCA-020, ¶ 21, 124 N.M. 606, 953 P.2d 1104 ("A failure to deliver the quality or quantity of goods or services contracted for, knowingly done, is a violation of the UPA when coupled with the other criteria of Section 57-12-2(D)." (internal quotation marks and citation omitted))).

Defendant's second argument focuses on the "in connection with" language of the second element of a UPA claim. Defendant argues that all facts related to the "post-sale adjustment of [Plaintiff's] insurance claim" are legally insufficient to support that element. (Doc. 98 at 7). Presumably, Defendant's reference to "post-sale" is to the date on which the Policy covering the claim at issue went into effect, which would be in February 2020 when the Policy was up for renewal. The alleged oral misrepresentations concerning the scope and timing of the ALE Policy provision would have occurred during the adjustment of Plaintiff's claim, which means they occurred after the Policy went into effect.

Defendant cites the Tenth Circuit's opinion in *Soseeah v. Sentry Insurance*, 808 F.3d 800 (10th Cir. 2015), in support of its argument that misrepresentations made in the post-sale adjustment period are not "in connection with the sale" of the insurance policy. The plaintiffs in *Soseeah* sought to represent a class of plaintiffs against the defendant insurance company for alleged violation of the UPA based on the defendant's failure to notify its insureds of the legal

consequence of two cases the New Mexico Supreme Court had, at the time, recently decided. *Id.* at 802. One of the issues on appeal was whether the plaintiffs had met the commonality requirement of Fed. R. Civ. P. 23(a). The plaintiffs argued, and the district court found, that the commonality requirement was met because the potential class members all experienced the same injury, i.e., the lack of proper notice of coverage available as a result of decision in the two cases. *Id.* at 807. Instead of resolving the commonality issue by asking the question whether the plaintiffs *alleged* a common injury, the *Soseeah* court resolved it by examining the claimed common injury on its merits. *See id.* at 809 (quoting the defendant's argument "that the district court's 'most glaring error was finding a common injury where the vast majority of class members *suffered no legally cognizable injury at all*.'" (emphases in original)). The court reasoned that the defendant's alleged conduct of failing to notify existing policyholders of the impact of the two New Mexico cases "occurred *after*, *rather than in connection with the sale* of policies at issue," and therefore "f[ell] outside of the scope of *the plain language* of the UPA." *Id.* at 810 (emphasis added). The court thus concluded that the defendant's alleged failure to provide notice of the two New Mexico decisions did not state a cognizable injury for purposes of a claim under the UPA.

The *Soseeah* court's conclusion in that case that the statutory language "in connection with the sale" required that the alleged misrepresentations had to have occurred before the sale of the insurance contracts supports Defendant's position here but cannot be read, as Defendant does, to stand for an absolute timing rule applicable to all UPA claims. In general, the case law supports the view that the "plain language of the UPA"—and, in particular, the specific "conjunctive phrase 'in connection with'"—is "designed to encompass a broad array of commercial relationships," including transactions in which there is no direct commercial relationship between the plaintiff and the defendant. *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 21, 142 N.M. 437,

442, 166 P.3d 1091, 1096. And beyond that, where a commercial transaction between the parties is involved, the overarching take-away from the case law in general is that a UPA claim can be based on alleged misrepresentations that occur *after* the parties entered into the contract under which the defendant failed to provide goods or services as promised.

For instance, in *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, 125 N.M. 748, 965 P.2d 332, a case involving a dispute between a distributor and manufacturer of commercial cleaning supplies, the court held that the defendant's conduct—*all* of which took place *after* the defendant entered into a supply contract with the plaintiff—was sufficient for a jury to find that the defendant "knowingly misrepresented to [the plaintiff] that it would sell certain products to [the plaintiff], which it then failed to deliver," in violation of the UPA. *Id.,* ¶ 18, 125 N.M. at 754, 965 P.2d at 338. Among other things, the post-contract conduct included "[the defendant's] approaching [the plaintiff's] customers with fallacious information concerning the future of [the plaintiff], its removing [the plaintiff's] dispensers and equipment from the premises of [the plaintiff's] clients, and its refusal to ship products to [the plaintiff] because of trumped-up billing problems." *Id.* The same conclusion was reached in a case from this District also involving a supply contract between a distributor and a manufacturer in which the plaintiff argued that the manufacturer's post-contract conduct amounted to a UPA violation based on a failure to deliver goods that the defendant had promised to supply. *See Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 728 F. Supp. 2d 1170, 1196–97 (D.N.M. 2010) (denying post-trial motions for JNOV or a new trial because the jurors could reasonably have found that post-contract misleading and disparaging statements by the defendants' sales force made to the plaintiff's customers about the plaintiff going out of business or becoming unable to supply those customers with products were "made in connection with" the defendant's sale of products to the plaintiff). And another case from

this District extended the reach of *Diversey Corp.* to the context of an insurer's post-sale denial of an insurance claim, observing that it was "a close call given that [the] [p]laintiff's quantum of evidence is significantly weaker than the evidence in *Diversey Corp.*," but nonetheless holding that "there is a genuine issue of material fact concerning [the] [d]efendants' alleged violation of N.M. Stat. Ann. N.M. Stat. Ann. § 57–12–2[(D)](17)." *Fuel Depot, LLC v. Travelers Cas. Ins. Co. of Am.*, 668 F. Supp. 3d 1212, 1225 (D.N.M. 2023). The *Fuel Depot, LLC* court further explained that, "[g]iven the record evidence that [the defendant insurer] first identified hail damage as the specific cause of loss and then later took the position that the premises did not sustain hail damage, a jury should decide whether [the] [d]efendants' allegedly changing positions amounted to 'a knowing misrepresentation ... in conjunction with a failure to deliver' insurance coverage." *Id.*[14]

There are other cases, as well, discussing similar issues in the context of an insurance policy. For instance, *Dellaira v. Farmers Insurance Exchange*, 2004-NMCA-132, 136 N.M. 552, 102 P.3d 111, upheld a UPA claim based on the alleged unfair or deceptive conduct of an insurer while adjusting the insureds' automobile insurance claims. The plaintiffs in *Dellaira* alleged that the automobile insurance policy obligated the insurer to indemnify the plaintiffs in an amount of money such that "[the] [p]laintiffs could purchase a like kind and comparable vehicle in their local marketplace," and that the insurance company failed to deliver on that promise when its adjuster offered the plaintiffs significantly less than the amount that would be required for that purpose. *Id.*, ¶¶ 19-21, 136 N.M. at 557–58, 102 P.3d at 116–17. The court held that a jury could find that the false statement was the adjuster's post-sale adjustment offer of $2,100 to settle the claim, which

[14] *Compare* (Doc. 12 at 3 ("Plaintiff's causes of action are not based on allegations that Defendant paid nothing on the claims she submitted. Instead, Plaintiff asserts that Defendant breached its contract and engaged in unfair insurance and trade practices by later reversing course and denying claims for damage arising from the same loss.")).

the court said could be viewed as a statement that "$2,100 was 'sufficient to allow the Plaintiffs to purchase … a comparable vehicle.'" *Id.* ¶ 21; 136 N.M. at 558, 102 P.3d at 117.

Significantly, *Dellaira* was cited in the *Soseeach* case when, after the Tenth Circuit remanded the case for consideration of the class certification issue in connection with two potential subclasses of plaintiffs, the district court held that the defendant insurer's mailing of misleading notices to its insureds *could* be considered a misrepresentation made "in connection with the sale" of the insurance policies, "even though those acts occurred sometime after the actual sales transactions." *Soseeah v. Sentry Ins.*, No. CIV 12-01091 RB/KK, 2016 WL 7435792, at *5 (D.N.M. Sept. 6, 2016).[15] The *Soseeah* district court noted that the plaintiffs "contend[ed] that the misleading notices regarding UM/UIM benefits constituted a 'failure to deliver the quality or quantity of goods or services contracted for[,]' one of the specific types of harm defined in the UPA." *Id.* (citing § 57-12-2-(D)(17)). The court then explained why, in its view, the post-sale misleading notices satisfied the "in connection with the sale" requirement, notwithstanding the Tenth Circuit's earlier decision in the case:

> Defendant Sentry's act of mailing its insureds information about theretofore unknown benefits under their policies was also an activity connected with the sale of services under the UPA. Just as valuation was relevant to the insurance claim in *Dellaira*, so too was notice of UM/UIM benefits to the insureds here—many of whom may have had insurance claims they did not make, but may have if they had received clear information from Defendant Sentry.

*Id.*

The "in connection with the sale" language is not found in subsection (D)(17), and it doesn't make sense to construe that language differently depending on which subsection of § 57-

[15] Apparently, not even the district court in the *Soseeah* case thought that the Tenth Circuit's finding regarding the "plain meaning" of the statutory language "in connection with the sale" represented an absolute timing rule that applied in all UPA cases.

12-2(D) is being construed. Moreover, the *Soseeah* district court applied the principles discussed in *Lohman*, as well as a similar case also involving a situation in which the plaintiff "never purchased goods or services from [the] [d]efendant[ ]," *Maese v. Garrett*, 2014-NMCA-072, ¶ 16, 329 P.3d 713, 719, in reaching the conclusion in that case that post-sale conduct could qualify under the "in connection with the sale" statutory language in the subsection (D)(17) context. *See Soseeah*, 2016 WL 7435792, at *5 (discussing the New Mexico courts' "broad construction of the element 'in connection with the sale of goods or services'" (quoting *Maese,* which was quoting *Lohman*; additional case citations omitted). According to this case law, "[the UPA] does [not] require a misrepresentation in the course of a sale between [the] plaintiff and [the] defendant; it merely requires that a misrepresentation be 'made in connection with the sale ... of goods [or services]' generally." *Lohman,* 2007-NMCA-100, ¶ 40, 142 N.M. at 445, 166 P.3d at 1097.

To be clear, the Court is only rejecting the absolute rule advanced by Defendant that post-sale adjustment conduct can never form the basis of a UPA claim because of the "in connection with the sale" language and the fact of the post-sale timing.

**C. The Plain Language of Subsection (D)(17) of N.M. Stat. Ann. § 57-12-2.**

Notwithstanding the rejection of that bright-line rule concerning the timing of a misrepresentation in connection with a UPA claim in determining whether Plaintiff has demonstrated facts supporting liability according to the UPA, the Court must apply the plain language of the statute to determine whether each element of that claim is supported by disputed facts. In addition to those portions of the UPA discussed already, subsection (D)(17) of N.M. Stat. Ann. § 57-12-2 of the UPA mandates that any alleged misrepresentation made in connection with the sale of a good or service must have resulted in Plaintiff having received less goods or services than Defendant contracted to deliver. To determine whether that result occurred, the Court must

consider exactly what Defendant was obligated by contract to deliver to Plaintiff concerning ALE coverage according to the insurance policy.

Defendant argue in the Motion that the Policy provides that if a covered loss results in part of the residence premises becoming unfit to live in, according to Coverage D, the Policy covers any necessary increase in living expenses incurred by the insured to maintain the insured's normal standard of living, for the shortest time possible to repair or replace the damages. Defendant goes on to argue that the Home Protector Plus Endorsement increased the coverage for ALE under Coverage D from necessary costs for the shortest time possible to the amount of ALE actually sustained by Plaintiff, with the broadened coverage limited to a 12-month period. Plaintiff argues in the response to the Motion that the Policy does not clearly limit ALE coverage to twelve months. *See* (Doc. 112 at 5-6). Plaintiff goes on to argue that the effect of the Endorsement is to reduce the coverage that would otherwise apply, and that Defendant is obligated to pay Plaintiff's necessary increase in living expenses until such time that the repairs are completed. (Doc. 112 at 6-7). Defendant responds to Plaintiff's argument in its reply brief by citing case law construing similar ALE policy provisions in favor of recognizing the 12-month time limitation in the Endorsement. *See* (Doc. 115 at 4-7).

The Court finds that a plain reading of the relevant Policy provisions taken together required Defendant to pay Plaintiff's alternative living expenses actually incurred as a result of a covered loss while the insured premises are being repaired, limited to the 12 consecutive months following the date of loss. The Policy initially provides in Coverage D for ALE payments for "any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; …for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere." Then

the Endorsement to the Policy modifies the ALE coverage by providing "We will pay the amount of loss covered by Coverage D which is actually sustained by you during the 12 consecutive months following the date of loss." According to the plain reading of those provisions, under the initial policy provisions Plaintiff would only have been entitled to necessary increases in living expenses to maintain her normal standard of living, and only for the shortest time required to repair or replace the damage. Pursuant to the Endorsement, ALE coverage is indeed expanded to those expenses actually sustained during the 12 months following a loss, rather than being limited to those shown to be necessary increases in living expenses to maintain a certain standard of living and only for the shortest time required to repair the damage.

Furthermore, the Court's interpretation of the insurance policy is consistent with the case law construing similar ALE coverage provisions of other similar insurance policies. *See Liberty Personal Ins. Co. v. Mayes*, Case No. 5:20-cv-009672022 WL 2427726, *3 (D.W.D. La., 2022) ("The dispute regarding the application of [the Loss of Use and Increased Use] provisions is not unique. At least two courts have addressed this issue, both coming to the same conclusion: operating together, the provision means that the insurer must pay ALE to the insured for as long as it takes to rebuild the insured's property, but in no case should ALE payment last more than twelve months."); *see also Kearns v. Liberty Ins. Corp.*, No. 24-2945, 2025 WL 1319431, *2 (9th Cir. 2025) ("When considered in 'their plain, ordinary and popular sense,' these two Policy terms do not create 'multiple reasonable expectations of coverage.' The HomeProtector Plus Endorsement, which cross-references the Nevada endorsement, unambiguously states that Liberty will pay loss-of-use benefits only during the twelve months following the date of loss. Read together, the two provisions unambiguously set a twelve-month limit on reimbursement for loss-of-use, subject to shortening if the property is repaired or the insured moves sooner" (internal

citation omitted)); *Hayes v. Liberty Ins. Corp.*, 526 Fed. Appx. 564, 567 (6th Cir. 2013) ("Here, the twelve-month limitation on payment of additional living expenses is not mere surplusage—clearly, Liberty can (and did) place a time limit on the payment of benefits to the Hayeses."). Defendant's Loss of Use and Increased Limits provisions are substantially similar to the provisions in the referenced cases and should likewise be interpreted as valid and enforceable.

The date of loss was June 13, 2020. The period ending 12 consecutive months after June 13, 2020 was June 12, 2021. According to Plaintiff, Defendant paid Plaintiff 's actual ALE expenses during the period from June 14, 2020 until February 28, 2021 and from October 1, 2022 until sometime in March, 2023, which is approximately 19 months after the date of loss. Also according to Plaintiff, she resided at the subject property from March, 2021 until October, 2022.

Plaintiff did request authorization for ALE beyond the approximately 19 months during which Defendant actually paid Plaintiff's ALE. Further, for purposes of this motion, the Court takes as true Plaintiff's proffered evidence that during the adjustment process the adjuster told Plaintiff that the ALE payments would essentially be unlimited. Notwithstanding that evidence proffered by Plaintiff, there is no evidence that the alleged statement or misrepresentation by the adjuster resulted in a modification of the Policy so that the contract term for ALE coverage would have extended beyond June 12, 2021. For instance, there is no evidence of an offer to modify the terms of the insurance policy, acceptance of that offer and consideration required for an enforceable contract. *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 669, 857 P.2d 776, 780 (1993) ("Ordinarily, to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent."). The Court is doubtful that an adjuster would have the legal authority, whether actual, apparent or inherent, to modify the insurance contract on behalf of Defendant, and there is not any evidence of such authority. *See, e.g., W. Agric. Ins. Co.*

*v. Legacy Med. Servs., LLC,* No. CIV 19-0679 JB\KRS, 2020 WL 4201825, at *20, *24-25 (D.N.M. July 22, 2020) (dismissing counterplaintiff's breach-of-contract claim because counterplaintiff had not alleged sufficient facts to show that insurer's agent had the authority to modify the insurance policy's terms). There is no evidence of a document containing any alleged modification to the Policy signed by Plaintiff and Defendant, as was likely required by the insurance policy for any such modification. In support of the UPA claim concerning the adjuster's alleged statements regarding the scope of ALE coverage, Plaintiff alleges that she requested coverage in excess of that actually paid by Defendant before she incurred the additional ALE, and that Defendant denied the request for additional ALE coverage. Thus, there is no evidence to support a claim by Plaintiff of detrimental reliance by Plaintiff on the alleged misrepresentation by actually incurring additional ALE, which might have excused the requirement of consideration to support any alleged contractual modification.

In short, there is no evidence that the Policy provisions concerning ALE coverage were modified from the terms of the written insurance policy which obligated Defendant to pay Plaintiff's ALE for 12 consecutive months from the June 13, 2020 date of loss, and Defendant provided ALE payments for a period in excess of 12 consecutive months from the date of loss. Therefore, regarding ALE coverage, Plaintiff received more rather than less goods or services than Defendant contracted to deliver. For this reason, Plaintiff's UPA claim fails and should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's Motion For Summary Judgment on Count III, **Doc. 98**, is **GRANTED**.

IT IS SO ORDERED this 13th day of November, 2026.

KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE